## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BHM HEALTHCARE SOLUTIONS, INC., ) <br> 5601 Mariner Street – Ste. 490 ) <br> Tampa, Florida 33609, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> URAC, INC., ) <br> 1220 L Street N.W., Suite 400 ) <br> Washington, D.C. 20005, ) <br> ) <br> Defendant. ) | Case No. _____ |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff BHM Healthcare Solutions, Inc. ("BHM") hereby files this Complaint against Defendant URAC, Inc. to enjoin Defendant from rescinding its independent review organization ("IRO") accreditation from BHM and alleges as follows:

### **JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the Parties are citizens of different states and the amount in controversy exceeds $75,000. Venue is proper under 28 U.S.C. § 1391(b)(1). The declaratory and injunctive relief sought in this action is authorized by 28 U.S.C. §§ 2201-2202.

### **PARTIES**

2. BHM is a for-profit corporation headquartered in Tampa Bay, Florida. BHM's annual revenues totaled approximately $6,300,000 in 2017. IRO services accounted for approximately ninety percent of its annual revenue. As an IRO, BHM provides third-party medical review services to health plans, third-party administrators, healthcare systems, and

utilization management organizations to determine whether medical services are medically necessary and eligible for coverage.

3. Defendant is a non-profit, accrediting entity headquartered in the District of Columbia. Defendant developed business standards and best practices for a variety of healthcare organizations, including IROs. Defendant uses these standards to "accredit" organizations to provide certain services.

## LEGAL BACKGROUND

4. Courts recognize that accrediting organizations, such as Defendant, "possess a special competence in evaluating the qualifications of an individual to engage in professional activities." *Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.*, 432 F.2d 650, 655 (D.C. Cir. 1970).

5. Courts require such organizations to apply their internally developed standards reasonably and with an even hand. *Id.*

6. When an accrediting organization essentially debars an entity from participating in the market, causing substantial economic and professional harm, judicial review is warranted. *Id.*

7. This review protects entities, such as BHM, from the accrediting organization's arbitrary and capricious application of its own standards.

## STATEMENT OF FACTS

*Background*

8. BHM maintains a comprehensive IRO program, providing its clients with both internal and external reviews.

9. An internal review is an evaluation conducted on behalf of a health plan, such as an insurance carrier, to determine whether a course of treatment is medically necessary.

2

10. When BHM receives a case for an internal review, a BHM staff member initially reviews the case for internal consistency (such as, ensuring a patient's age and gender are consistently stated throughout) before assigning the case to a BHM peer reviewer.

11. The peer reviewer then evaluates the case and drafts a recommendation as to whether the treatment is medically necessary.

12. The recommendation and underlying data used by the peer reviewer to draw his or her conclusion is submitted to a BHM staff member for an internal quality check. After the quality check, the BHM staff member submits the recommendation and underlying data to the client.

13. During the quality check, the staff member reviews the determination for logical consistency, addressing potential concerns with the peer reviewer.

14. BHM staff members do not change the peer reviewer's determination without the peer reviewer's approval.

15. The BHM staff member may make other changes without the peer reviewer's appriovial, such as spelling or formatting.

16. If an internal review results in a denial or reduction of coverage, it is known as an "adverse benefit determination."

17. Patients (or their representatives) can appeal adverse benefit determinations. In such instances, the health plan will submit the determination, underlying data, and appeal to an IRO for an external review.

18. BHM also provides external review services, but has developed safeguards to protect against conflicts of interest.

19. Upon receipt of a request for external review, BHM assigns it to a peer reviewer.

20. The peer reviewer evaluates the adverse benefit determination and submits a written decision either upholding or overturning the determination.

21. The peer reviewer submits said decision to a BHM staff member who places the information on a BHM template, which generates a letter to notify the client whether the peer reviewer upheld or overturned the adverse benefit determination.

22. The client receives only the letter containing the peer reviewer's determination.

23. BHM's external reviews are based solely on the opinion of the peer reviewer and are not influenced by anyone else.

24. BHM conducts approximately 37,000 internal and external reviews annually.

***Defendant's Accreditation Program***

25. Defendant developed an accreditation program for its IRO: Comprehensive Review (Internal & External) – 5.0 Program.

26. BHM entered an agreement with Defendant in August 2014 to become an accredited IRO under this program. *See* Exh. 1, Attach. 3.

27. During the accreditation process, Defendant reviewed all of BHM's policies, procedures, and internal systems. Defendant found that BHM's program met or exceeded all Defendant's standards, known as the "Core Requirements."

28. Defendant deemed BHM an accredited IRO on August 2, 2015 for a term of three years, expiring on August 1, 2018.

29. BHM has not made any material changes to its applicable policies and procedures since receiving Defendant's accreditation.

30. Defendant's accreditation is frequently a prerequisite to providing IRO services to healthcare organizations.

31. At least forty percent (and as many as eighty percent) of BHM's clients require that BHM have Defendant's accreditation.

32. On July 25, 2017, BHM applied for reaccreditation for an additional three-year term commencing on August 2, 2018. *See* Exh. 1, Attach. 4.

33. On May 2, 2018, URAC found BHM's policies and procedures in 100 percent compliance with URAC's Core Requirements as part of URAC's reaccreditation evaluation. *See* Exh. 1, Attach. 18.

34. URAC has also scheduled an onsite visit as part of this reaccreditation evaluation for late June 2018, which, but for this controversy, should result is BHM's accreditation commencing on August 2, 2018 for a three-year period.

***Defendant's For-Cause Review***

35. On August 11, 2017, Defendant notified BHM that a grievance had been filed against BHM. Defendant also announced its intention to conduct an onsite For-Cause Review. *See* Exh. 1, Attach. 5.

36. Over the next several months, Defendant requested copious amounts of information and documentation. BHM responded to all of Defendant's requests promptly. *See* Exh. 1, Attach. 6, at 24-25.

37. On November 27, 2017, Defendant visited BHM's premises as part of its For-Cause Review.

38. On January 10, 2018, Defendant rescinded BHM's accreditation and removed BHM from its online accredited organization database. *See* Exh. 1, Attach. 7.

39. Defendant's letter to BHM alleged that some policies, procedures, and internal validation systems that Defendant had assessed favorably thirty months earlier were not in compliance with Defendant's Core Requirements.

5

40. Defendant's letter did not cite any intervening change in Defendant's Core Requirements that would have required BHM to modify its policies, procedures, or internal systems.

41. On January 12, 2018, BHM appealed Defendant's decision.

42. On January 19, 2018, Defendant reinstated BHM's accreditation, but set the accreditation to lapse on March 1, 2018 (rather than August 1, 2018). On January 31, 2018, after BHM's repeated requests, Defendant reset the expiration date of BHM's current accreditation to August 1, 2018.

43. On January 24, 2018, after several requests, Defendant finally provided BHM with a detailed, written explanation of the allegations supporting its decision to rescind BHM's accreditation.

44. In accordance with Defendant's representations as to the proper appeals process, BHM submitted a comprehensive written response to Defendant's January 24, 2018 letter and report on February 22, 2018. *See* Exh. 1, Attach.6.

45. The following IRO Core Requirements are at issue in this case:

   a. IRO Core 4 – Regulatory Compliance;

   b. IRO Core 11(c) – External Review: Independent Review Policy;

   c. IRO Core 13 – Information Management;

   d. IRO Core 17(a)(ii) – Performance Monitoring; and

   e. IRO Core 32 – Senior Clinical Staff Responsibility.

**Core Requirement 4.**

46. Core Requirement 4 requires an accredited organization to implement a regulatory compliance program that tracks applicable laws and regulations, ensures the organization

complies with those laws and regulations, and responds promptly when corrective actions are needed. See Exh. 1, Attach. 8.

47. To support rescinding BHM's accreditation, Defendant cited a single instance when a filing had not been submitted to the Florida Secretary of State.

48. This omission resulted not from BHM's negligence, but from National Corporate Research, Ltd.'s failure to notify BHM to file the appropriate report. *See* Exh. 1, Attach. 6, at 5-9.

49. National Corporate Research Ltd. is a corporation BHM utilized to track corporate filing deadlines and, if hired by BHM to do so, make the appropriate filings.

50. When BHM became aware of the issue in September 2017, two months before Defendant's For-Cause Review, BHM remedied the situation within two hours of discovering the error.

51. Defendant did not explain how this single incident demonstrated BHM's noncompliance with Core Requirement 4.

52. Defendant cited no other instance of statutory or regulatory noncompliance, and certainly not any circumstance that jeopardizes the privacy or health and safety of BHM's consumer population.

### Core Requirements 11(c), 13(a), and 17(a)(ii).

53. Defendant's allegations regarding Core Requirements 11(c), 13(a), and 17(a)(ii) center on the same set of facts, particularly Core Requirements 11(c) and 13(a).

54. During the onsite review, Defendant desired to test BHM's *external* review process.

55. To do so, Defendant asked BHM to run a search of every review report that had a change after completion. This search yielded approximately 300 files.

7

56. Of the 300 files, Defendant selected thirty for further evaluation.

57. All thirty review files resulted from *internal* rather than *external* reviews. In BHM's response to Defendant's allegations, BHM pointed out this crucial fact to Defendant. Yet, Defendant disregarded it.

58. For accuracy, defendant should have drawn its sample from the entire pool of cases BHM had reviewed since its accreditation. There were 72,265 total cases available during Defendant's evaluation.

*Core Requirement 11(c)*

59. Core Requirement 11(c) requires an accredited organization to maintain a written external review policy that limits the organization's decision to the peer reviewer's conclusion alone. *See* Exh. 1, Attach. 10.

60. This Core Requirement specifically states that it applies to external reviews and not the internal review files URAC chose to evaluate for this finding. *See id.*

61. However, based on its review of *internal* review files, Defendant concluded that BHM did not comply with its requirement that *external* reviews be based solely on the peer reviewer's conclusion. *See* Exh. 1, Attach. 6, at 13-14.

62. Internal review reports undergo an internal quality assurance process, which allows a BHM staff member to evaluate a report for logical consistency. BHM staff members do not change the peer reviewer's determination without the peer reviewer's approval.

63. Had Defendant evaluated BHM's external review files, it would have found that BHM was (and continues to be) in compliance with Core Requirement 11(c).

*Core Requirement 13(a)*

64. Core Requirement 13(a) requires an accredited organization to ensure the data integrity of its information systems. *See* Exh. 1, Attach. 11.

8

65. Defendant alleged that BHM had made changes to peer reviewers' final reports, misciting BHM's informational systems' policies and procedures.

66. Defendant also confused "record" and "report."

67. The report is the product that BHM submits to clients after completing a review. However, the record is a compilation of electronic data points that describe any work or changes made to a report. If there were a change to a report, for instance, the record's data point would describe the change and why the change occurred. The record data points were readily available to Defendant.

68. Only a BHM system administrator is able to make such changes to the record as are warranted in limited circumstances. These changes are immaterial to the peer reviewer's decision and are often made before the case is submitted to the peer reviewer. This ability does not compromise the external or internal review process at all.

69. BHM's policies, procedures, and practices ensure that in rendering a review decision, BHM's bases its decision upon the conclusion of the reviewer. *See* Exh. 1, Attach. 12.

*Core Requirement 17(a)(ii)*

70. Core Requirement 17(a)(ii) requires an accredited organization to perform a quality check of each review before submitting the case to the client. If an issue is discovered, the organization must document each issue and outcome. *See* Exh. 1, Attach. 13.

71. A 'quality issue' is a situation in which the auditor determines that there may be a mistake, or clarification needed, in the peer reviewer's determination. For example, if the auditor sought clarification of the underlying decision or noticed a conflict in the final decision, this may represent a quality issue that would need to be discussed with the peer reviewer.

9

72. Defendant alleged that BHM did not document the issues and outcomes of nineteen of twenty-six quality checks, resulting in a twenty-seven percent compliance rate to Core Requirement 17(a)(ii).

73. Defendant based its finding on the incorrect premise that a case is complete when "the Peer Reviewer makes the final clinical decision and submits the file to [BHM]." *See* Exh. 1, Attach. 6, at 15. Rather, internal reviews are completed when the IRO delivers the reviews to the client/health plan. On the other hand, external reviews are completed when the determination goes to the patient or their designee.

74. Of the twenty-five internal review files that Defendant examined that had final audits, twenty-two did not need quality check documentation because no issue was presented. *See* Exh. 1, Attach. 6, at 14-19.

75. The five that did not receive quality checks predated early 2017 when BHM implemented a quality improvement process to ensure that all internal reviews receive a documented final quality check.

76. The issues cited with the remaining three files resulted from communication issues only and, in no instance, was a reviewer's work quality or decision integrity questioned.

77. BHM has modified its procedures to ensure that such communication errors do not present erroneous findings such as these in the future.

78. BHM's quality improvement process ensures its compliance with Core Requirement 17(a)(ii).

### Core Requirement 32(b).

79. Core Requirement 32(b) requires a senior clinical staff person's program responsibilities to include "oversight of clinical decision-making aspects of the program." *See* Exh. 1, Attach. 14.

80.     During the onsite visit, Defendant's reviewers interviewed a former BHM medical director, Dr. Jennifer Jackson-Wohl. In the interview, Dr. Jackson-Wohl stated that she could not answer the reviewers' questions regarding her role and responsibilities as a senior clinical staff person.

81.     Defendant took this statement at face value and did not seek corroboration from BHM.

82.     Dr. Jackson-Wohl resigned shortly thereafter.

83.     BHM provided Defendant with evidence contradicting Dr. Jackson-Wohl's statement to the reviewers, including timesheets, emails, a document describing her oversight responsibility (which she signed), and a transcript of a training video wherein Dr. Jackson-Wohl detailed her oversight responsibilities. *See* Exh. 1, Attach. 15.

84.     Despite this evidence, Defendant still alleged BHM lacked compliance with Core Requirement 32(b).

85.     Another BHM medical director is currently covering Dr. Jackson-Wohl's duties. *See* Exh. 1, Attach. 16.

***Defendant's Final Decision to Uphold the Rescission and Its Consequences***

86.     Despite BHM's comprehensive written response to Defendant's allegations, URAC upheld its decision to rescind BHM's IRO accreditation.

87.     Defendant informed BHM of its decision via telephone call on May 15, 2018 and advised that a letter would follow.

88.     On May 16, 2018, Defendant sent BHM a letter via email with its decisions. *See* Exh. 1, Attach. 17.

89.     In its notice, Defendant overturned some of its findings, but upheld enough of them to sustain its original decision to rescind BHM's IRO accreditation.

11

90. Defendant's final decision overturned the following findings:

   a. Core Requirement 4(a), which requires organizations to track applicable laws and regulations;

   b. Core Requirement 4(c), which requires organizations to promptly respond to any instances of noncompliance with applicable laws and regulations and take corrective action; and

   c. Core Requirement 11(c), which requires external reviews to be based solely on the conclusions of the reviewers.

91. Defendant's final decision upheld the following findings:

   a. Core Requirement 4(b), which requires organizations to ensure compliance with applicable laws and regulations;

   b. Core Requirement 13(a), which requires organizations to maintain information systems that provide for data integrity;

   c. Core Requirement 32(b), which requires that the senior clinical staff person's program responsibilities include oversight of clinical decision-making aspects of the program; and,

   d. Core Requirement 17(a)(ii), which requires organizations to conduct quality checks and document any issues that may present.

92. Defendant's final notice does not explain Defendant's rationale for these decisions, but simply lists the Core Requirements it upheld, rending the appeals process meaningless and futile.

93. Defendant's final notice also does not offer reasoned analysis for how BHM's arguments and evidence were insufficient to demonstrate compliance with the Core Requirements.

94. As a result of Defendant's rescission, BHM believes it is ineligible to apply for reaccreditation for at least one year.

95. The application process following this "cooling off" period will take between nine and twelve months.

96. Without Defendant's accreditation, BHM will likely lose its current contracts and be unable to compete for new contracts with organizations that require Defendant's accreditation. *See* Exh. 1, Attach. 19.

97. Further, Defendant's rescission may jeopardize BHM's relationships with its clients who do not require URAC's accreditation.

98. Even if BHM could maintain business operations until reaccreditation, which it likely cannot, the reputational harm BHM will suffer as a result of Defendant's arbitrary action will likely have lasting effects.

99. In addition to client losses, BHM will also have to lay off staff, whose expertise could not be easily replaced.

## CAUSES OF ACTION

### COUNT I

### Common Law Due Process

100. Plaintiff realleges and incorporates by reference herein paragraphs 1 through 99, above.

101. Since Defendant's accreditation is a "virtual prerequisite to the practice," the court can "scrutinize[] the standards and procedures employed" by Defendant to rescind the accreditation of BHM. *Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.*, 432 F.2d 650, 655 (D.C. Cir. 1970). This common law due process right requires that Defendant's standards "be reasonable, applied with an even hand, and not in

13

conflict with the public policy of the jurisdiction." *Id.* Because BHM will suffer a "deprivation of substantial economic or professional advantages" as a result of Defendant's unlawful action, this Court's review is warranted. *Id.*

102. Defendant arbitrarily and capriciously deviated from the terms of the parties' contract and from Defendant's own policies and procedures to rescind BHM's accreditation, violating BHM's common law due process rights, disregarding the facts presented, and subjecting BHM to substantial economic, professional, and reputational harm.

103. Therefore, BHM is entitled to declaratory and injunctive relief.

## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

104. Plaintiff realleges and incorporates by reference herein paragraphs 1 through 99, above.

105. BHM's contract with Defendant includes the covenant of good faith and fair dealing, which prevents Defendant "from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015) (internal quotation and citation omitted). Defendant's arbitrary and capricious acts and omission constitute a breach of this covenant. *Id.*

106. Therefore, for Defendant's breach of contract, BHM is entitled to recover damages.

## **PRAYER FOR RELIEF**

**NOW, THEREFORE**, BHM requests that this Court:

    A.    Declare that Defendant's bases for rescinding BHM's IRO accreditation are arbitrary, capricious, and in violation of Defendant's internal policies

and procedures and in violation of BHM's common law due process rights;

B. Declare that Defendant must reverse the rescission of BHM's IRO accreditation;

C. Declare that Defendant breached its contract with BHM;

D. Declare that Defendant's Indemnification Clause as written is unconscionable and therefore null and void;

E. Issue a temporary restraining order, followed by a preliminary and permanent injunction, consistent with the above declarations 1) restoring BHM's accreditation in full and 2) requiring Defendant to continue its reaccreditation process in a manner consistent with the appropriate standards, rules, and policies to afford BHM its contractual and due process rights;

F. Award BHM damages, costs, and attorney's fees incurred in the prosecution of this action, and costs and attorney's fees incurred in Defendant's internal appeals process; and

G. Grant such other relief as the Court deems warranted and just.

Respectfully submitted,

*/s/ Christopher J. Frisina*
Edward T. Waters (DC Bar No. 422461)
Phillip A. Escoriaza*
Christopher J. Frisina (DC Bar No. 1033185)
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com

pescoriaza@ftlf.com
cfrisina@ftlf.com

Counsel for Plaintiff

*Application for pro hac vice pending