# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BHM HEALTHCARE SOLUTIONS, INC.,**

Plaintiff,

v.

**URAC, INC.,**

Defendant.

Case No. 1:18-cv-01119 (TNM)

## MEMORANDUM OPINION

BHM Healthcare Solutions, Inc. ("BHM"), a medical review service provider, seeks a preliminary injunction against URAC, Inc.'s ("URAC") revocation of its accreditation as an independent review organization. Am. Compl. 1, ECF No. 15. BHM argues that URAC applied its review standards arbitrarily and capriciously, violated BHM's common law due process rights and breached the implied covenant of good faith and fair dealing, and that without an injunction, its business will suffer significant loss. *Id.* ¶¶ 169-93. URAC asserts, among other defenses, that the parties' contract prohibits BHM from bringing this action, and therefore seeks dismissal of the case. Opp. to Pl.'s Mot. for Prelim. Inj. ("Opp. to Mot. for Prelim. Inj.") 16, ECF No. 14; Mot. to Dismiss 12-16, ECF No. 17.[1] The Court finds that the exculpatory clause in the parties' contract precludes this action and that the clause is not unconscionable. BHM's Motion for a Preliminary Injunction will be denied and URAC's Motion to Dismiss will be granted.

---

[1] While briefing was ongoing for the Motion for a Preliminary Injunction, BHM filed an Amended Complaint; URAC responded with a Motion to Dismiss. *See id.* The parties agreed during a telephone conference that both motions could be considered together and consolidated into one Memorandum Opinion. *See* Minute Entry, June 19, 2018.

# I.    BACKGROUND

## A.  BHM and Its Accreditations from URAC

BHM, a for-profit corporation headquartered in Florida, provides medical review services to health insurance plans, healthcare systems, and related administrators and management organizations.  Am. Compl. ¶ 2.  Most of its business, which reached $6.3 million in revenues in 2017, is based on services provided as an independent review organization ("IRO") assessing whether medical services are medically necessary and eligible for coverage.  *Id.*  BHM's IRO services are divided between "internal" reviews where a BHM peer reviewer determines in the first instance either to approve medical treatment or deny or reduce coverage (an "adverse benefit determination"), and "external" reviews where a BHM peer reviewer reviews an adverse benefit determination made by another IRO and either upholds or overturns it.  *Id.* ¶¶ 10, 12, 17-21.  URAC is a non-profit entity headquartered in the District of Columbia; it evaluates and accredits organizations that provide IRO services.  *Id.* ¶ 3.

BHM has provided IRO services since 2002, but first became URAC-accredited in August 2012 after increasing client demand for this accreditation.  Supp. Decl. of Brian Johnson ("Supp. Johnson Decl.") ¶¶ 9, 25, ECF No. 15-1.  During oral argument, BHM attributed much of this sea change to the Patient Protection and Affordable Care Act ("ACA") and revisions to the Code of Federal Regulations requiring third party reviews to be conducted by "an IRO that is accredited by URAC or by [a] similar nationally-recognized accrediting organization."  45 CFR § 147.136(d)(2)(iii) (2016); TRO Hr'g Tr. 17, May 21, 2018.  The initial accreditation lasted for a term of three years.  *See* Am. Compl. ¶ 39.

In September 2014, BHM and URAC entered an Accreditation Application Agreement (the "Contract") for another three-year accreditation.  *Id.*; *id.* Ex. 1 Attach. 3 ("2014 Contract"),

ECF No. 15-4.  As part of its accreditation process, URAC conducted an onsite validation review and evaluated BHM's policies, procedures, and internal systems against URAC's standards (the "Core Requirements").  Am. Compl. ¶ 35.  Having successfully met the Core Requirements, BHM received another three-year accreditation from August 2015 to August 2018.  *Id*. ¶¶ 35, 39.  As this is the revoked accreditation at issue, the provisions of this Contract control.

In July 2017, before the August 2015 accreditation expired, BHM applied for re-accreditation.  *Id*. ¶ 41.  BHM's desktop review was successful and URAC found BHM to be in full compliance with all "Mandatory Standard Elements."  *Id*. ¶ 42; *Id*. Ex. 1 Attach. 5, ECF No. 15-6.  In late May 2018, after this action began, URAC wrote to BHM that it "looks forward to moving ahead with you into the next phase of the accreditation process."  *Id*. Attach. 6, ECF No. 15-7.  On July 13, 2018, BHM's application was approved, and BHM will be "fully accredited by URAC effective August 1, 2018."  Def.'s Supp. Mem. Regarding Pl.'s Mot. for Prelim. Inj., ECF No. 20.  Nonetheless, the company still seeks relief because of the reputational harm from the prior revocation's "lasting effects."  *See* Am. Compl. ¶ 175.

### B.  URAC's Revocation of BHM's Accreditation

In August 2017, URAC informed BHM that it received a grievance reporting "[c]oncerns about the quality of services, edits of clinical determinations on reviews completed by peer reviewers."  *Id*. Attach. 7, ECF No. 15-8.  URAC requested documentation from BHM relating to Core Requirements 17 (Performance Monitoring) and 18 (Summary Reports).  *Id.*  URAC notified BHM that after reviewing the information requested, it could conduct, among other remedial measures, a "for cause" onsite review "[s]hould further steps become necessary to complete this investigation."  *Id.*  URAC did perform an onsite review in late November 2017, led by Dr. Karen Watts.  Am. Compl. ¶ 49.  Dr. Watts and her team interviewed only non-

leadership BHM staff members, except for Dr. Jennifer Jackson-Wohl, BHM's Medical Director for Behavioral Health, who resigned from BHM shortly afterwards. *Id.* ¶¶ 54, 149. BHM complains that URAC did not conduct an entrance or exit conference contrary to previous practices, nor permitted senior leadership to be present during the interviews. *Id*. ¶¶ 51-55. BHM also had no opportunity to review or discuss Dr. Watts' findings while she was onsite or anytime later until January 9, 2018, when URAC informed BHM that it was revoking BHM's accreditation. *Id*. ¶¶ 58-59.

The following day, URAC provided BHM with a "Scoring Summary Report" listing each Mandatory Standard Element and URAC's determination whether or not it was met. *Id*. Ex. 1 Attachs. 10-11. Over the next few weeks, BHM sought clarification and documentation from URAC about its decision and rationale, *id.* ¶ 75, resulting in Dr. Watts sending a three-page document to BHM briefly explaining the findings of non-compliance. *Id*. Ex. 1 Attach. 12. The document explained that BHM was non-compliant with the following Core Requirements for these reasons:[2]

- **Core Requirement 4(b)** ("ensures the organization's compliance with applicable laws and regulations") – BHM failed to file the annual report necessary for incorporation in Florida. The report was due between January 1 and May 1, 2017 and BHM's corporation status was dissolved due to the failure to file the report. BHM paid a penalty and was reinstated on September 26, 2017.
- **Core Requirement 13(a)** ("provides for data integrity") – BHM "could not provide system demonstration or policy or procedure that support Reviewer decisions were not being changed." Contrary to BHM's policy that stated that "once the independent review is complete, a record can only be changed or edited by the system administrator (President/CEO) following a strict protocol," reviewers found that several individuals demonstrated that they had access to the drop-down menu that permits changes to a Peer Reviewer's decisions; others stated that changes could be made with the Peer Reviewer's approval;

---

[2] In addition to the four Core Requirements listed, Dr. Watts identified non-compliance with Core Requirements 4(a), 4(c), and 11(c), which were later overturned by URAC's Executive Committee. *Id.* ¶¶ 156-58.

and interviewees apparently stated that the "strict protocol" referenced in the policy was under development.

- **Core Requirement 17(a)(ii)** ("The organization conducts a quality check and if a review does not meet the organization's quality standards, then each issue and its outcome are documented") – 30 files were randomly selected from a report provided by BHM listing any file with changes after completion (in URAC's view, "completion" means after a Peer Reviewer makes a final clinical decision) and only 27% of the files had documented issues and outcomes. *See also* Am. Compl. ¶ 131.
- **Core Requirement 32(b)** ("is responsible for oversight of clinical decision-making aspects of the program") – During the interview of the BHM's senior clinical staff person, Dr. Jackson-Wohl, she claimed to be unaware of her IRO roles and responsibilities.

*Id*. Ex. 1 Attach. 12.  BHM submitted a 26-page written response to the findings outlined in the document.  *Id*. ¶ 89; *see also id.* Ex. 1 Attach. 8 ("BHM Appeal"), ECF No. 15-9.  The arguments in its internal appeal to URAC are largely the same as those in its Amended Complaint and Motion for a Preliminary Injunction.

As for Core Requirement 4(b), BHM explained that it relied on a third-party agent to track deadlines and make the appropriate filings and that, when the agent changed names and updated its record in Florida, it inadvertently excluded the email address for BHM's point of contact, leading to a missed deadline for the annual filing.  *Id*. at 7.  Once BHM discovered the issue, it corrected the error and received reinstatement within hours.  *Id*.  BHM also argued that URAC's own Accreditation Guide states that it "is evaluating that the organization has a mechanism in place to comply with regulatory requirements; URAC is not verifying that the organization is in compliance with those regulations."  *Id*. at 6.  BHM now also argues that Florida law treats corrected dissolutions as retroactive to the effective date of the dissolution, as "if the administrative dissolution had never occurred."  Mem. in Support of Mot. for Prelim. Inj. ("Mot. for Prelim. Inj.") 11, ECF No. 13-1 (quoting Fla. Stat. § 607.1422(3)); *see also* Am.

Compl. ¶¶ 97-103.  To BHM, it is irrational for URAC to hold it accountable for this error when Florida itself does not.  *See* Mot. for Prelim. Inj. 11.

As for Core Requirement 13(a), BHM argued that URAC erred by not speaking with its Chief Information Officer ("CIO"), opting instead to speak with the Compliance Officer and clinical specialists who are not subject matter experts on data integrity and security.  BHM Appeal 9-10.  BHM claimed that URAC's findings all derived from a misunderstanding of BHM's systems and terminology, which would have been avoided had URAC interviewed the CIO or conducted an exit conference.  *Id.* at 10-11.  BHM now also contends that its electronic record tracks any changes made, and that the arbitrariness of URAC's decision is underscored by the fact that URAC has identified no instance in which a BHM employee made an improper change.  Mot. for Prelim. Inj. 14-15; *see also* Am. Compl. ¶ 118.

For Core Requirement 17(a)(ii), BHM quarreled with URAC's definition of "completion" as "when the Peer Reviewer makes the final clinical decision and submits the file to the Applicant" rather than "after a quality check has been completed" and submitted to the ultimate client.  BHM Appeal 16; Mot. for Prelim. Inj. 11-12.  The difference matters, BHM says, because it means that the case files URAC selected for review are not within the scope of this Core Requirement.  *Id.* at 11; Am. Compl. ¶¶ 129-30.  Substantively, BHM argues that, for the cases sampled where a quality check occurred, most of the cases identified no issues and so required no follow-up.  Mot. for Prelim. Inj. at 12-13; *see also* BHM Appeal 17.  For the remaining cases sampled where a quality check was not conducted, BHM explains that the cases were older and completed under a then-existing protocol that did not require documentation at all if no issue arose during the quality check.  *Id.*  BHM points to URAC's guidance, which accepts

"'documentation by exception'" as standard industry practice. *Id.*; Mot. for Prelim. Inj. 12; Am. Compl. ¶ 136.

Last, for Core Requirement 32(b), BHM appealed because the Medical Director interviewed left the company soon afterward, suggesting that her answers were, at best, unreliable or, at worst, intentionally false. BHM Appeal 12. BHM presented evidence showing that the Medical Director was aware of her oversight role of the clinical program, including timesheets, copies of emails, a signed job description, and a transcript of a training video. *Id.*; Mot. for Prelim. Inj. 15; Am. Compl. ¶ 150. In its Amended Complaint and motion for a preliminary injunction, BHM argues that another individual, Dr. Daniel Harrop, also served as a behavioral health clinical staff person and was also capable of overseeing behavioral health, meeting the requirement that "URAC will verify that there is a senior clinical staff person, other clinicians, or a combination of the two available to cover the clinical areas"). *Id.* ¶ 152; Mot. for Prelim. Inj. 16.

URAC's Executive Committee reviewed BHM's appeal and upheld the findings of non-compliance with these four Core Requirements. Am. Compl. ¶¶ 156, 159. The Executive Committee overturned three other findings of non-compliance, but it found that the upheld findings were enough to sustain the revocation of BHM's accreditation. *Id.* ¶¶ 156, 158.

### C. Proceedings in this Action

The day after BHM received notice of URAC's Executive Committee's decision to uphold the revocation of accreditation, it sought a temporary restraining order and preliminary injunction from this Court. Mot. for TRO and Mot. for Prelim. Inj., ECF No. 2. I denied the motion for a temporary restraining order. Minute Order, May 21, 2018. A revised motion for a preliminary injunction followed, and BHM filed an Amended Complaint while the motion was

being briefed. URAC responded to the Amended Complaint with a motion to dismiss and the parties agreed that both motions could be considered together given the similar arguments made. *See* Minute Entry, June 19, 2018.

BHM seeks a preliminary injunction to restore its accreditation in full and to order URAC to conduct its grievance and accreditation processes consistent with the Core Requirements and BHM's contractual and due process rights. Mot. for Prelim. Inj. 26. BHM asserts two causes of action: the violation of common law due process and breach of the implied covenant of good faith and fair dealing. *Id*. at 25-26. BHM also seeks a determination that a provision in the parties' contract purporting to preclude judicial review is unconscionable. *Id*. at 26.

URAC argues that the parties' governing contract explicitly precludes filing a judicial action. Opp. to Mot. for Prelim. Inj. 16-22; Mot. to Dismiss 12, 16. On the merits, URAC argues that substantial deference should be given to the determinations of accrediting organizations and that no claim exists for the breach of the implied duty of good faith and fair dealing in the context of accreditation determinations. *Id.* at 34-35; Opp. to Mot. for Prelim. Inj. 22-28, 35-36. URAC also disagrees that BHM has met any of the factors considered by courts in evaluating motions for preliminary injunctions. *Id.* at 3.

## II.     LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy never awarded as of right" but is an exercise of a court's equitable discretion. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction "must establish" that it is (1) likely to succeed, (2) likely to suffer irreparable harm without preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Id.* at 20. Historically, these four factors have been balanced and evaluated on a "'sliding scale,'" where a

strong showing in one factor can compensate for a weaker showing on another factor. *Davis v. Pension Benefits Guaranty Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). But the Supreme Court's decisions in *Winter* and *Munaf v. Green*, 553 U.S. 674, 690 (2008), suggest that the standard may be more exacting: a party seeking a preliminary injunction must establish both a likelihood of success on the merits and irreparable harm. *Davis*, 571 F.3d at 1292 (demurring on whether the stricter standard applies); *id.* at 1295-96 (explaining that the "old sliding-scale approach" may no longer be controlling) (Kavanaugh, J., concurring).

A party may move to dismiss a complaint because it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This requires the complaint to contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is insufficient if it merely offers "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 546). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In evaluating a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *See In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). Last, "[i]n determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial

notice." *Hurd v. District of Columbia Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (internal

quotation omitted).

## III. ANALYSIS

The exculpatory clause in the parties' Contract, which is not unconscionable, precludes

this action from judicial review. For this reason, URAC's Motion to Dismiss must be granted.

This determination also means that BHM has failed to show a likelihood of success on the

merits, which is fatal under *Winter*'s suggestion, if not holding, that this factor is "an

independent, free-standing requirement for a preliminary injunction." *See Sherley v. Sebelius*,

644 F.3d 388, 393 (D.C. Cir. 2011). Even if considered under a sliding scale approach, BHM's

showing of irreparable harm does not overcome its deficient showing on the likelihood of

success on the merits. *See Davis*, 571 F.3d at 1292 (determining that the court need not decide

whether the stricter standard applies because the plaintiffs lose under a sliding scale approach).

### A. The Parties' Contract Precludes Judicial Review and Is Not Unconscionable

#### 1. The Plain Meaning of the Exculpatory Provision Precludes Judicial Review

The parties' Contract sets clear limitations on BHM's legal rights (referred to within the

Contract as the "Applicant"):

> Applicant agrees that it will not file or take any legal or regulatory
> or administrative action against URAC, its directors, officers,
> employees, agents, or advisors in connection with the accreditation
> process including the denial, *revocation*, suspension, corrective
> action, or any other action effecting Applicants [*sic*] accreditation
> status.

2014 Contract § I.V. (emphasis added). This action involves the revocation of BHM's

accreditation and is a legal action against URAC. It is thus squarely within the clear prohibition

on legal action agreed to by the parties. *See Spellman v. Am. Sec. Bank, N.A.*, 504 A.2d 1119, 1127 (D.C. 1986) ("The construction of a written agreement is a question of law when its provisions are unambiguous.").

Although District of Columbia case law does not directly address the validity of exculpatory clauses for accreditation decisions, exculpatory clauses in other contexts have been upheld. *See id.* § III.G. (selecting the District of Columbia as governing law); *Ferenc v. World Child, Inc.*, 977 F. Supp. 56, 61 (D.D.C. 1997) ("Exculpatory contract provisions are valid and enforceable in the District of Columbia."). In *DLY-Adams Place, LLC v. Waste Management of Maryland, Inc*., 2 A.3d 163, 167-70 (D.C. 2010), the court affirmed the trial judge's ruling that a forbearance agreement prevented the plaintiff from bringing a lawsuit to inhibit the defendant's use of an alleyway. The court determined that the contractual language was "plain and unambiguous" and that the plaintiff could not "challenge the plain reading of the forbearance agreement simply because it does not like its effect." *Id*. at 168. Provisions releasing defendants from liability in tort actions have also been reviewed without issue, *see, e.g.*, *Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 731-735 (D.C. 1987) (remanding a case to determine the meaning and effect of a liability release), *McKenna v. Austin*, 134 F.2d 659, 662 (D.C. Cir. 1943) (finding that the release signed "would discharge defendant by operation of law.").

Courts in other districts have considered the issue in circumstances more like accreditation. In *Sanjuan v. American Board of Psychiatry and Neurology, Inc.*, the court upheld a contractual agreement to handle internally any disagreements over the plaintiffs' failed applications for entrance into the American Board of Psychiatry and Neurology, and rejected the argument that the release was an unconscionable contract of adhesion. 40 F.3d 247, 248-49 (7th Cir. 1994). The court noted that the Board, a private organization, may determine its rules for

membership and administration, and that removing the release would likely increase the cost of application which most applicants would oppose. *Id*. at 249. Similar agreements for other national certifications have been upheld. *See, e.g.*, *Whyte v. Am. Bd. of Physical Med. & Rehab.*, 393 F. Supp. 2d 880, 888-90 (D. Minn. 2005) (citing *Balaklaw v. Am. Bd. of Anesthesiology, Inc.*, 562 N.Y.S.2d 360, 361-63 (Sup. Ct. 1990), *Am. Registry of Radiologic Technologists v. McClellan*, No. 300-cv-2577, 2003 WL 22171702, at *2-3 (N.D. Tex. Mar. 5, 2003)). In these cases, the courts "have upheld release provisions that bar medical professionals from suing a certifying board because of actions taken by the board during the certification process." *Whyte*, 393 F. Supp. 2d at 889. The circumstances of these cases are analogous to BHM's and URAC's relationship—BHM, the applicant, is suing over the decision of URAC, a private certifying entity, not to afford it a certain designation (here, an accreditation). The jurisdictions in most of these other cases recognized the validity of exculpatory clauses, as the District of Columbia does. *See Sanjuan*, 40 F.3d at 249 (Illinois law); *Whyte*, 393 F. Supp. 2d at 888 (Minnesota law); *McClellan*, 2003 WL 22171702 at *2 (Texas law).

BHM argues that *Sanjuan*, *Whyte*, and *Balaklaw* all suggest that their holdings may be different were membership an "economic necessity," Reply in Supp. of Mot. for Prelim. Inj. 19, but it has not shown that the District of Columbia has any similar prohibition.[3] In addition to the similarities between these facts and other cases just described, the parties here were also known

---

[3] In *Sanjuan*, the court held that despite the plaintiff's argument that the Board was the only organization in the United States offering this certification, it was not a "practical necessity for his livelihood;" in other words, it was not required for the plaintiff to practice physical medicine and rehabilitation. 393 F. Supp. 2d at 888-89. The parties here agree that URAC may be the only accrediting entity for IROs, TRO Hr'g Tr. 21, May 21, 2018, but it is also undisputed that BHM successfully operated for a decade before initially seeking and obtaining URAC accreditation. Supp. Johnson Decl. ¶¶ 9, 25. While passage of the ACA may have made accreditation more valuable, and indeed, necessary for many contracts, it is not necessarily the case that BHM could not sustain a successful business model without URAC accreditation.

to each other, having successfully contracted in 2012 and maintained a three-year relationship without issue. Thus, in 2014, when BHM paid over $26,000 to contract with URAC for another three years, 2014 Contract § I.B., it had already operated under URAC's rules (which neither party has alleged changed) without issue; no evidence has arisen suggesting that when BHM entered the 2014 Contract, it was not negotiating at arm's length; and presumably the price of application would have been higher and less desirable if BHM had sought to contract around the exculpatory clause. Given these considerations, the plain language of the provision, and the similarities between this case and the examples cited by the parties, all operating against the backdrop of a presumption of enforceability of exculpatory clauses, I find that the exculpatory clause in the parties' contract precludes judicial review of this action.

### 2. The Contract Is Not Substantively Unconscionable

BHM seeks to save its claim by arguing that the exculpatory clause is unconscionable. Mot. for Prelim. Inj. 29-33, Opp. to Mot. to Dismiss 21-24. To establish that a contract is unconscionable, the party seeking to avoid the contract must show "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983). In other words, the challenging party must establish both procedural unconscionability—how the contract was made, and substantive unconscionability—the actual terms of the contract. *Id.* An unconscionable contract must "affront[] the sense of decency" and the party seeking to avoid the contract must show that the "terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Id.* at 100 (internal quotation marks omitted). To determine this question of law, a court looks beyond the four corners of the contract to the "commercial setting, purpose, and effect of the contract." *Id.*

Here, the record reflects no extraordinary circumstances—except potentially one, discussed below—that make the Contract one of adhesion. A contract of adhesion is "one imposed upon a powerless party, usually a consumer, who has no real choice but to accede to its terms." *Woodroof v. Cunningham*, 147 A.3d 777, 789 (D.C. 2016). That a contract is "take-it-or-leave-it" cannot establish procedural unconscionability; a party must show that the "parties were greatly disparate in bargaining power, that there was no opportunity for negotiation and that the services could not be obtained elsewhere." *Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 181 (D.D.C. 2016). BHM has not provided contemporaneous evidence to suggest that, when it entered the contract in September 2014, the parties did not negotiate in good faith or at arm's length; it also has not argued that exculpatory clauses were not recognized in the law or not accepted business practice at the time. *See generally* Mot. for Prelim. Inj. 29-33, Opp. to Mot. to Dismiss 21-24. Both parties are sophisticated commercial entities that had transacted before without issue, and BHM does not suggest that URAC's contract terms changed between its initial term of accreditation and the 2014 Contract. *See id.*

Instead, BHM focuses on the fact that, because it needs URAC accreditation "to maintain the viability of its business," it is a powerless party relative to URAC. Mot. for Prelim. Inj. 30. It alleges that this relative disparity meant that it could not have negotiated more favorable terms over the exculpatory clause. *Id.* at 31. Other than this brief, conclusory statement, BHM provides no evidence to show that it considered this avenue or that it tried, and failed, to negotiate amendment of the exculpatory provision. *See id.* BHM finds it an "absurd" suggestion that the parties had equal bargaining power because URAC has four times the revenue and was the "gatekeeper to the IRO marketplace," *id.* at 30 n.9, but this argument proves too much. The law does not require that parties have equal revenues to make an enforceable contract; the law

also specifically contemplates, and condones, certifying entities acting as "gatekeepers" giving applicants the stamp of approval to engage in an activity under a certain professional designation. *See, e.g.*, *Sanjuan*, 393 F. Supp. 2d at 888-89 (rejecting plaintiff's argument, part of which was based on the fact that the certifying board was the only organization in the United States offering the certification). Stripped to its essence, BHM's argument is that the Contract was procedurally unconscionable because it was a "take-it-or-leave-it" contract, which even they admit is insufficient. *See* Mot. for Prelim. Inj. at 30 (citing *Ruiz*, 156 F. Supp. 3d at 181). Based on these arguments, BHM has failed to show that the "parties were greatly disparate in bargaining power, [and] that there was no opportunity for negotiation." *See id.*

A fact that perhaps differentiates BHM's and URAC's Contract is that in November 2015, the Department of Health and Human Services promulgated a final rule, effective January 1, 2016, requiring IROs to be "accredited by URAC or [a] similar nationally-recognized accrediting organization." 80 Fed. Reg. 72,192, 72,269 (Nov. 18, 2015) (codified at 45 C.F.R. § 147.136(d)(2)(iii)). This codified URAC's role as the gatekeeper to entities seeking to provide IRO services and strengthens BHM's argument that URAC's "services could not be obtained elsewhere." *See Ruiz*, 157 F. Supp. 3d. at 181.

Although the rule allows for accreditation by a similar national organization, the parties have made no written representations that any similar accrediting organization exists, either now or in 2014, and URAC admitted during oral argument that it is unaware of another similar organization. *See* TRO Hr'g Tr. 21, May 21, 2018. So, URAC is the sole accrediting organization sanctioned by the Government to determine which entities can provide IRO services, and organizations on both the supply (subject to the ACA and/or and seeking IRO services) and demand (seeking to provide IRO services) sides are bound by its determinations.

Having the United States Government's imprimatur is significant, as shown here by BHM's testimony that the market has increasingly required URAC accreditation and its estimation that a majority of its IRO revenues is now accreditation-dependent. Supp. Johnson Decl. ¶¶ 9, 25; Am. Compl. ¶¶ 2, 170. Even Dr. Watts from URAC describes the ACA to "require[] all health plans to adhere to the external review process that . . . recognizes IROs as eligible . . . if the IROs are accredited by 'a nationally recognized private accrediting organization." Opp. to Mot. for TRO Ex. 1 ("Decl. of Karen Watts") ¶ 13, ECF No. 8-2. Thus, that URAC accreditation is codified in Government regulations sets this situation apart from the mine-run of cases where applicants are free to choose whether to seek accreditation or certification. This unusual circumstance counsels toward finding that the contract was procedurally unconscionable. Ultimately, however, I do not have to reach this question,[4] because the contract was not substantively unconscionable.

Substantive unconscionability turns on whether the Contract terms are "unreasonably favorable to the other party," *Urban Invs.*, 464 A.2d at 99, and requires "an assessment of whether the contract terms are so outrageously unfair as to shock the judicial conscience." *Fox v. Computer World Services Corp.*, 920 F. Supp. 2d 90, 99 (D.D.C. 2013). A substantively unconscionable contract is "one that 'no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *Hill v. Wackenhut Services Intern.*, 865 F. Supp. 2d 84, 95 (D.D.C. 2012) (quoting *Hume v. United States*, 132 U.S. 406, 411 (1889)).

---

[4] I stop short of reaching this question because the regulation issued over a year after the parties signed the Contract and the record is not fully developed about the state of the IRO industry when the parties signed the Contract.

Here, the Contract and URAC's policies are not substantively unconscionable, as they provide for the opportunity to be heard before neutral decision-makers and include a robust investigative and appeals process. The Contract outlines the grievance and for cause review procedures followed: a "for cause" review "may be initiated by URAC as a result of grievance resolution," 2014 Contract § I.R.1., after which URAC will determine whether any review standards were violated and if "the violation is egregious, in URAC's sole judgment; URAC may suspend or revoke accreditation." *Id*. § I.S. Adverse accreditation decisions may be appealed within URAC. *Id*. § I.T. Accreditation determination disputes, including revocations of accreditation, are "finally resolved" through this appeals process. *Id*. §§ I.T., III.A. These were precisely the steps followed here. While these provisions tilt in URAC's favor (*e.g*., the decision to revoke accreditation is in URAC's sole judgment), these provisions are not unreasonably favorable to it because the process uses a multi-tiered approach to making final a determination and, within it, affords applicants the ability to appeal adverse decisions.

In addition to following the investigation, decision, and appeal procedures outlined in the Contract, URAC followed its Grievance Administration and Appeals Management policies. *See* Decl. of Karen Watts ("Watts Decl.") Exs. A-B. URAC notified BHM of the grievance and started an initial investigation, during which it determined that a for-cause review should occur. *See id*. Ex. A. §§ IV.B.2.-3, C. After the for-cause review, the investigator provided her findings to URAC leadership, who submitted the findings to URAC's Accreditation Committee. Watts Decl. ¶ 25. All members of the Accreditation Committee are volunteers (*i.e.*, none are URAC employees), and they make their decision on a blinded basis, meaning that they are unaware of the identity of the organization. *Id*. ¶¶ 26, 42. Based on the evidence presented, the Accreditation Committee decided to revoke BHM's accreditation and informed BHM of its right

to appeal to the Executive Committee, which may accept, reject, or modify the Accreditation Committee's decision. *See id*. ¶¶ 34, 39; *see also id*. Ex. B at § I. BHM submitted written materials for the Executive Committee's decision. *Id*. ¶ 41. BHM's Executive Committee, whose voting members are volunteers (again, not URAC employees), also considered the appeal also on a blinded basis. *Id*. ¶¶ 31, 33. The Executive Committee, exercising its authority, overturned the Accreditation Committee's decision on three findings, but upheld the Accreditation Committee's decision on four findings. *Id*. Ex. C. Under URAC's scoring methodology, the failure of three or more elements results in the denial (or here, revocation) of accreditation. *See id*. ¶ 44. This process—which provided for a multi-step process with blind grading at each critical stage and the opportunity to respond to the revocation decision in writing—is not unreasonably favorable to URAC.

BHM challenges aspects of each step of the process as deficient. It does not dispute URAC's authority or decision here to conduct a "for cause" review but alleges that the for cause review team did not offer BHM an entrance or exit conference or spend meaningful time with senior leadership, that it did not permit management to be present during the interviews with staff, and that BHM leadership lacked the opportunity to discuss the team's initial findings or answer any questions. *See* Am. Compl. ¶¶ 51, 53-55, 57-58. It also alleges that URAC provided only summary information about why it was revoking BHM's accreditation, that URAC expanded the scope of the review beyond the scope of the initial grievance filed, and that it is unsure what information URAC used in making the revocation decision and appeal. *Id*. ¶¶ 52, 70, 88, 95. It also quarrels with the appeals process, objecting to not being permitted to review the redacted (*i.e.*, blinded) version of its appeal documents, not being provided a copy of any

other materials put before the Executive Committee, and being refused to present its appeal in-person to the Executive Committee. *Id*. ¶¶ 92-94.

But focusing on these complaints misses the forest for the trees. Ultimately, these tiffs do not alter the big picture; that BHM received written notice of the elements on which it was considered non-compliant and the reasons for the determinations, it was provided an opportunity to present written arguments, and its internal appeal went through two layers of blinded evaluation. Both the terms of the contract and the process afforded to BHM are not so outrageously unfair as to shock the judicial conscience, and the Contract is therefore not substantively unconscionable. So, the Court will dismiss BHM's claims.

### B. A Preliminary Injunction Should Not Be Granted, as BHM Has Not Shown a Likelihood of Success on the Merits

The enforceable exculpatory clause of the parties' Contract settles this lawsuit. Even balancing the four preliminary injunction factors, however, BHM would not be entitled to a preliminary injunction. Under *Winter*'s suggestion that likelihood of success on the merits is "an independent, free-standing requirement for a preliminary injunction," *Sherley*, 644 F.3d at 393, the Court's analysis on the exculpatory clause is determinative. Under the historical sliding scale approach, the Court finds that BHM's lack of likelihood of success on the merits weighs decisively in favor of determining that it is not entitled to a preliminary injunction.

Setting aside the exculpatory clause, analyzing BHM's claims on the merits still leads to the conclusion that the company is unlikely to succeed. BHM's action is based on the implied covenant of good faith and fair dealing and its common law due process rights. Am. Compl. ¶¶ 187-93. BHM claims that URAC's "application of its standards was arbitrary, unreasonable, and contrary to the facts" and that it denied BHM due process when it "reviewed and rescinded

BHM's accreditation without meaningful opportunity to be heard, proper disclosure of pertinent facts, or a reasoned decision." Mot. for Prelim. Inj. 23. The standards BHM cites focus on reviewing for arbitrary and capricious (*i.e.*, not unreasonable) decision-making. *See Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013) (explaining that a breach of the implied duty of good faith and fair dealing must either involve bad faith or conduct that is arbitrary or capricious); *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (explaining that "'fair dealing' involves reasonable rather than arbitrary or capricious action"); *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 190 (D.D.C. 2016) (stating that an arbitrary or capricious decision is one that "could not be fairly characterized as the product of reasoned decision-making."). Although these cases arose in the context of employment disputes, *Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs.*, 432 F.2d 650, 655 (D.C. Cir. 1970), considered an accreditation denial. There, the D.C. Circuit, relying on cases from various districts, summarized that courts will "scrutinize[] the standards and procedures employed" and that the "standards set must be reasonable, applied with an even hand, and not in conflict with the public policy of the jurisdiction." The Court's role is not to conduct a *de novo* review of the evidence, but to determine whether URAC's decision-making process was reasonable and supported by the evidence before it. *See Kumar*, 174 F. Supp. 3d at 190. This is necessarily a deferential standard because "professional societies possess a specialized competence in evaluating the qualifications of an [entity] to engage in professional activities." *Marjorie Webster*, 432 F.2d at 655.

Courts confronted with accreditation-specific cases use similar standards. *McKeesport Hospital v. Accreditation Council for Graduate Medical Education* recognized that "accreditation associations [should] employ fair procedures when making decisions affecting

their members," 24 F.3d 519, 534-35 (3d Cir. 1994); *Medical Institute of Minnesota v. National Association of Trade & Technical Schools* required an accrediting agency to "confirm its actions to fundamental principles of fairness," 817 F.2d 1310, 1314 (8th Cir. 1987); and *North Dakota v. North Central Association of Colleges and Secondary Schools*, 99 F.2d 697, 700 (7th Cir. 1938) noted that accreditation decisions would not survive if "arrived at arbitrarily and without sufficient evidence." And more recently, in *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 781 F.3d 161, 170, 172 (4th Cir. 2015) applied the arbitrary and capricious and fairness standards to uphold an accreditation denial.

Notably, these cases are all in the higher education accreditation, and few cases address applying these standards outside that context. *See* Mot. to Dismiss 17 (citing one 2015 district court case in which the Western District of Virginia declined to extend the federal common law right to due process outside the context of higher education). But given the similarities between the industries—both the higher education and IRO services industries are highly regulated, both provide services affecting the public, and both involve accreditation from private organizations—it is appropriate to follow the same standard in this accreditation context.[5]

Under this deferential analysis, URAC's decision was not arbitrary or capricious. For each of the four standards upheld by URAC's Executive Committee, BHM argues that URAC

---

[5] URAC contends that that the duty of good faith and fair dealing does not cover challenges to accreditation decisions, and quotes from cases where courts have dismissed accreditation actions brought under breach of contract. Mot. to Dismiss 34-35. But these cases also reference that the "deferential principles of administrative law" could apply instead. *Tsamota Certification Ltd. v. Ansi ASQ Nat'l Accreditation Bd. LLC*, No. 17-cv-839, 2018 WL 1936840, at *6 (E.D. Wis. April 24, 2018); *see also Found. For Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 532 (6th Cir. 2001) ("the Foundation did not act in an arbitrary or unreasonable manner in denying the College's accreditation application"). I therefore assume for the sake of argument that in the District of Columbia, an accreditation decision can be reviewed under an arbitrary and capricious standard.

considered the "wrong" evidence or should have employed other procedures to ensure that it obtained and considered the "right" evidence. *See* Mot. for Prelim. Inj. 10-16. As detailed in Section I.B., the arguments that BHM makes to this Court largely mirror those that it advanced in its 26-page written appeal to the Executive Committee.

The Committee's decision to uphold the findings are supported by the record. For example, for Core Requirement 4(b), not even BHM disputes the fact that it failed to file the annual report necessary for incorporation in Florida, and that its corporate status was dissolved for months as a result. BHM Appeal 7. It argues for essentially a "no harm, no foul" rule because its corporate status was reinstated and made retroactive, but this does not change the fact that the evidence still supports a finding of non-compliance. *See id.* For Core Requirement 13(a), BHM argues that URAC should have spoken with BHM's CIO instead of the clinical specialists who showed that they could access the drop-down menu that permits changes to be made to a reviewer's decision. *Id.* at 9-10. Again, the evidence—which not only involved this demonstration, but other testimonial evidence as well—supports URAC's finding, and it was entitled to fashion its investigation in a way that efficiently and sufficiently answered its inquiries. Am. Compl. Ex. 1 Attach 12. Who URAC selects to interview, as well as what questions it asks, and whether and to what extent it conducts any follow-up, are matters within its discretion that neither BHM nor this Court should dictate. The same analysis applies for Core Requirements 17(a)(ii) and 32(b). BHM disputes URAC's substantive findings and argues that URAC should have ceded to BHM's explanations for its seeming non-compliance. Mot. for Prelim. Inj. 11-14, 15-16. But URAC, on three separate occasions, two of which were on a blinded basis, determined that evidence gathered during the for-cause investigation was enough to sustain a finding. The final decision-maker, the Executive Committee, made its decision with

the benefit of BHM's written appeal. This Court will not disturb these findings, which were made upon review of the facts by a knowledgeable entity with subject matter expertise, when they are supported by the record and adequately explained by URAC. *See* Mot. to Dismiss 27-33 (explaining its determinations); *Kumar*, 174 F. Supp. 3d at 190 (D.D.C. 2016) (an arbitrary or capricious decision is one that "could not be fairly characterized as the product of reasoned decision-making.").

As for URAC's decision-making process, the record shows that it followed "fundamental principles of fairness." *See Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d at 1314. As described in greater detail in Section I. A.2., URAC followed its written procedures throughout this process, involving: receiving a grievance, conducting a preliminary investigation, starting a for cause review, conducting a site visit, making a determination, and considering and resolving an appeal. There is no evidence of bias against BHM at any point throughout the proceedings; indeed, both the Accreditation and the Executive Committees considered the evidence and made their decisions on a blinded basis. Members of these committees also are unpaid volunteers and not URAC employees. At the Executive Committee level, BHM submitted a written appeal to advocate its case. And as evidence of the process working, the Executive Committee overturned three of the seven findings below. These steps—the several levels of independent and unbiased review with the opportunity to respond—satisfy any common law due process rights that BHM has.

In summary, BHM cannot show a likelihood of success on the merits, both because of the exculpatory language in the parties' Contract and because URAC's determinations were the

product of reasoned decision-making and a fair process.  I conclude that BHM's inability to succeed on the merits is determinative and warrants a denial of the its Motion.[6]

### C.  URAC's Motion to Dismiss Should Be Granted

Because the parties' contractual language is valid and enforceable, URAC's Motion to Dismiss must be granted.  BHM's Amended Complaint, even if the allegations it contains are assumed to be true, does not state claims for which the Court may grant relief, as BHM agreed to the exculpatory clause that precludes it from pursuing legal action for URAC's revocation decisions.

---

[6] Because this case must be dismissed under the exculpatory clause, the Court need not linger on the other preliminary injunction factors.  But consideration of these factors demonstrates that BHM would not be entitled to an injunction in any case.

The Court agrees that BHM likely suffered significant reputational harm resulting from a revocation of its accreditation.  Though BHM did not provide any concrete evidence of a loss of clients, and though URAC has since re-accredited BHM for 2018, the Court assumes that the "irreparable harm" factor would tip in BHM's favor.

The balance of equities in this case is in equipoise.  It is true that URAC is the sole accrediting entity that governs who may provide IRO services under the ACA.  Thus, a loss of URAC accreditation harms BHM's capacity to conduct third party reviews for several clients.  However, URAC's status as the sole accrediting entity also means that public trust in the fairness and efficacy of its review processes is paramount. The perception that it may permit non-compliant entities to continue providing critical, medical services would severely erode this trust.

Finally, the public interest is better served by denying a preliminary injunction. BHM argues that its lack of accreditation "disrupt[s] reviews of medical decisions for hundreds of patients and health plans, delaying prior authorization and coverage determinations until the health plans and patients can resubmit their cases to other IROs."  Mot. for Prelim. Inj. 29.  However, BHM has not cited any support for this claim, and other accredited IROs could likely step in to service BHM's clients.  Thus, it does not appear that any public harm would be long-lasting.  On the other hand, as discussed, the ability of the public to trust URAC-accredited entities is of the utmost importance due to URAC's status as the sole accrediting organization.

## IV.     CONCLUSION

For these reasons, the Plaintiff's Motion for a Preliminary Injunction will be denied and the Defendant's Motion to Dismiss will be granted.  A separate order will issue.


_____
Dated: July 20, 2018                                    TREVOR N. MCFADDEN, U.S.D.J.